No. 65,438

MALCOLM MILLER, as Executor for the Estate of Paul C. Yankey, Jr., *Plaintiff*, v. INSURANCE MANAGEMENT ASSOCIATES, INC., WILLIAM C. COHEN, JR., R. K. BARRETT, JOE MODDRELL, JR., RICHARD MATASSARIN, PAUL G. STARR, JOSEPH C. LUKENS, II, DANIEL E. NYBERG, THOMAS A. BERRY, AND MICHAEL D. LYNCH, *Defendants/Appellees*.

(815 P.2d 89)

Opinion filed July 12, 1991.

*Timothy J. Finnerty*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Kelly J. Rundell*, of the same firm, was with him on the briefs for appellants Mark G. Ayesh and Ayesh, Herd & Theis.

*Jeffery A. Jordan*, of Foulston & Siefkin, of Wichita, argued the cause, and *Robert L. Howard* and *C.A. Beier*, of the same firm, were with him on the brief for defendants/appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal from an order entered by the district court disqualifying Mark G. Ayesh, Esq., and his law firm of Ayesh, Herd & Theis, from representing the estate in this case. Ayesh was disqualified pursuant to Rule 1.9(a) (1990 Kan. Ct. R. Annot. 235) of the Model Rules of Professional Con-

duct (MRPC), Supreme Court Rule 226 (1990 Kan. Ct. R. Annot. 210). The district court also disqualified Ayesh from further representation of the estate pursuant to MRPC 3.7 (1990 Kan. Ct. R. Annot. 267) and DR 5-102 (1990 Kan. Ct. R. Annot. 184).

Insurance Management Associates, Inc., (IMA) is a Kansas corporation engaged in business as an insurance agency. Paul C. Yankey, Jr., was the first president of IMA and the second largest individual shareholder from its formation on January 1, 1974, until his death on June 14, 1986. In May 1984, the board of directors (Board) of IMA designated Yankey to draft a new stock purchase agreement between IMA and its shareholders. The Board authorized Yankey to employ counsel to assist in this drafting. In early July 1984, Yankey contacted Malcolm Miller to draft the new agreement. Miller and Yankey then retained Ayesh the same month to assist in drafting the agreement.

Ayesh subsequently prepared a memorandum discussing the proposed agreement. Miller asked Ayesh to draft the same memorandum in a more formal fashion for circulation among shareholders of IMA. A memorandum dated July 19, 1984, proposed a general outline for the stock purchase agreement, and Ayesh knew that this memorandum would be distributed to the Board, which occurred at the July 30, 1984, board meeting. The Board knew that Yankey was working with Miller in drafting the agreement but was not aware that Yankey and Miller had hired Ayesh to assist.

From July to early October 1984, Ayesh worked on the proposed stock purchase agreement concerning the repurchase of stock from any IMA stockholder upon his or her disability, retirement, or death. He prepared the initial draft on his word processor, but numerous subsequent drafts were prepared by IMA.

Ayesh testified at the hearing on the motion to disqualify that he considered Yankey to be his client during the drafting of the agreement but also acknowledged that he had a professional responsibility to draft the agreement for the benefit of all shareholders of IMA, not just Yankey. Ayesh believed his job was to make sure the agreement complied with the shareholders' objectives from a technical and tax standpoint.

In his deposition, Ayesh testified that he understood he was to be Yankey's "drafter and technical adviser from a tax standpoint on the composition of the agreement." But Ayesh recognized that, through Yankey, he was "in effect, representing all of the parties to the shareholder agreement or to the stock purchase agreement."

Ayesh's billing statement for his work on the agreement was on his letterhead and delivered to Miller, but it was not specifically addressed to anyone. It contained a statement for "legal and tax services for 1984" based on 108 hours' work on the agreement, resulting in a total bill of $11,500. On December 11, 1984, Ayesh received a check from an account of IMA in the amount of $11,500. The check reflects a handwritten note initialed by Yankey, indicating "OK to pay. Tax work and drawing of stock purchase agreement."

Later, Ayesh received a stock purchase agreement dated February 19, 1985, which was executed by all shareholders of IMA. This agreement is identical to the December 1, 1984, "final draft" except for two differences, including one additional predicate paragraph in the preamble and alteration of the age of a shareholder when the stock repurchase obligations of IMA commence.

Yankey died on June 14, 1986. Upon his appointment as executor, Miller retained Ayesh as counsel to the estate. Ayesh filed a petition for probate of will on June 30, 1986.

On February 3, 1987, IMA delivered the 1986 year-end financial statements for IMA to Miller as executor for the Yankey estate. This was the basis for the appraisal used to value IMA stock for repurchase from Yankey's estate. On February 9, 1987, Miller met with defendant Moddrell to discuss why life insurance proceeds received by IMA after Yankey's death were not reflected on the financial statements as an asset of the company. Following this meeting, IMA consulted with counsel at the Foulston & Siefkin law firm.

Appraisals, which were based on the 1986 year-end financial statements, were delivered to Miller on March 25, 1987. A check for the purchase of Yankey's stock based upon the appraised value of IMA stock on December 31, 1986, was delivered to Ayesh on March 31, 1987. Miller and Ayesh rejected the value determined by the appraisers and claimed that life insurance proceeds should

have been added to the net worth of IMA. Miller and Ayesh also claimed that the Board improperly manipulated the company's books to depress that value.

Ayesh asserted and testified that, during the drafting of the stock purchase agreement, Yankey had advised Miller that the parties to the agreement decided that the proceeds of the key-man life insurance obtained to fund the purchase of stock under the agreement would be included in IMA's net worth to increase the appraised value of IMA. Ayesh further testified that the agreement was intentionally left silent regarding the treatment of life insurance proceeds because generally accepted accounting principles would control IMA's treatment of the insurance proceeds and create this result.

This position is directly contrary to defendants' assertion that they intended the opposite treatment of the key-man life insurance proceeds. Defendants Cohen and Lukens allege that Yankey had told them that life insurance proceeds would not be included in the appraisal of IMA under the agreement. This assurance was consistent with IMA's purpose and intent to buy life insurance for the sole purpose of funding the purchase of the stock, not to increase the value of IMA.

In its findings of fact, the district court stated:

"29. The interpretation of the agreement asserted by the Estate is directly contrary to the testimony of the defendants regarding the intent of the parties to the agreement and the defendants' interpretation thereof. The testimony and exhibits presented at the hearing established that Mr. Ayesh provided substantive legal advice and services in drafting the agreement for IMA and its shareholders as to matters directly in issue in this case. Mr. Ayesh was more than a mere scrivener and considered himself to be providing tax and business type legal advice on the structure of the agreement. Specifically, with regard to the life insurance proceeds, Mr. Ayesh has testified that he is the person who first brought up the subject with Mr. Miller and that Mr. Miller was to find out how the shareholders wanted to treat life insurance proceeds in the agreement. Although Mr. Ayesh did not personally talk to the shareholders, Mr. Miller is alleged to have raised the issue with Mr. Yankey, at Mr. Ayesh's request, and Mr. Ayesh has testified that Mr. Miller advised him the shareholders of IMA had decided not to address life insurance in the agreement. Mr. Ayesh has testified the agreement was, therefore, left silent on the treatment of insurance proceeds. Because the agreement is silent on this issue, it is likely that evidence will be presented at trial regarding the intent of all of the parties involved in the drafting [of] the agreement, including Mr. Ayesh and Mr. Miller."

In a settlement proposal dated October 23, 1989, Ayesh and his cocounsel Frederick Dorwart, of Tulsa, Oklahoma, requested, for the first time, that IMA consent to Ayesh's serving as trial counsel for the estate. On January 12, 1990, defendants requested that Ayesh voluntarily withdraw from his representation of the estate, based upon his violation of MRPC 1.9 and his position as a witness relating to the controversy. Ayesh refused, and defendants filed the motion to disqualify.

The district court concluded that the evidence presented at the hearing and exhibits admitted by the parties established the existence of an attorney-client relationship between Ayesh and IMA and its stockholders in the drafting of the stock purchase agreement. The district court rejected Ayesh's argument that he was a mere technical adviser in drafting the agreement because he had been actively involved in the actual drafting and allegedly raised the issue regarding valuation of life insurance proceeds. Ayesh also allegedly obtained information about the intent of all the parties to the agreement. Because the interpretation of the agreement and the intent of the parties were substantially related, the interests of the estate and the defendants were materially adverse. The court concluded:

"Defendants by proof of high quality, have met their burden of proving the elements of a violation of Rule 1.9 by Mr. Ayesh. Mr. Ayesh did not consult with his former clients as required by Rule 1.9 and did not receive the consent of his former clients to his representation of the Estate in this matter. He failed to even request consent in any form until October 1989."

The district court also concluded that Ayesh's involvement in drafting the agreement made him a material witness to disputed facts and required his disqualification from further representation of the estate, pursuant to MRPC 3.7 and DR 5-102. The court ordered that Ayesh and the firm of Ayesh, Herd & Theis were disqualified from further representation of the estate, were required to remove all files relating to the litigation from Ayesh's office, and were to deliver all original file materials to defendants' counsel of record.

After the trial court entered its findings of fact and conclusions of law disqualifying Ayesh and his firm, a motion for reconsideration or alteration was filed. This was considered by the court

at a hearing on June 1, 1990; no one appeared on behalf of the estate. The court granted correction of a clerical error in the case number of the estate's probate action but denied the remainder of the motion to reconsider the court's prior order disqualifying Ayesh. A notice of appeal concerning the order of disqualification was filed by Ayesh on June 29, 1990. The estate did not appeal from the order of disqualification and is not named as a party in the notice of appeal filed by Ayesh.

During the pendency of this appeal, the underlying litigation between the estate and IMA was settled. On January 22, 1991, a journal entry of dismissal with prejudice was filed, granting the joint motion of plaintiff Miller as executor for the estate of Yankey and the defendants to dismiss this action with prejudice. Defendants subsequently filed a motion to dismiss this appeal on three procedural grounds: (1) Ayesh and his firm lacked standing and were not proper parties to the appeal; (2) the disqualification order was not appealable as a final order and appellants Ayesh, Herd & Theis did not properly perfect an interlocutory appeal; and (3) the case was moot since the underlying litigation had been settled. The Court of Appeals denied this motion "with leave to reassert arguments in brief on the merits." Defendants have asserted the arguments raised in this motion in their brief, incorporating by reference the motion and memorandum in support thereof.

A number of issues are raised by appellants relative to the district court's order of disqualification. However, we first consider whether this appeal should be dismissed as moot because the parties to the lawsuit have reached a settlement on the underlying case. As previously noted, a journal entry was filed in district court dismissing this action with prejudice upon the request of both the estate and defendants. Therefore, if Ayesh and his firm are successful in establishing that the disqualification order was inappropriate, they have no clients to represent in an action below.

This court recently discussed the principles underlying mootness in *State ex rel. Stephan v. Johnson*, 248 Kan. 286, 807 P.2d 664 (1991). *Johnson* was a quo warranto action to remove defendant from the office of board member of the Kansas State Board of Education. The district court granted the State's motion

for summary judgment, and the Court of Appeals affirmed. After this court granted review, Johnson was defeated in his primary election and subsequently resigned from his position with the Board.

In his appeal, Johnson challenged the constitutionality of K.S.A. 25-1904, which prohibits a state employee from serving as a member of the Kansas State Board of Education. Johnson, who was a faculty member at Wichita State University, was prohibited by 25-1904 from serving on the Board. After discussing at length the rules adopted by this court concerning mootness, this court concluded that the issues raised by respondent in the appeal were moot because he had resigned his position and gave no indication of a desire to seek that office again.

This court in *Johnson* noted the well-established rule that the appellate courts will not consider or decide a question on appeal when it appears that any judgment that might be rendered would be unavailing. 248 Kan. at 288. See *Dickey Oil Co. v. Wakefield*, 153 Kan. 489, 111 P.2d 1113 (1941). A controversy must exist that requires adjudication instead of an abstract proposition that requires an advisory opinion.

In support of their argument that this case is moot, defendants cite several Kansas decisions in which the parties settled the case, making the issue moot and requiring dismissal of the action pending on appeal. *Perrine v. Perrine*, 144 Kan. 219, 58 P.2d 1080 (1936), involved an action among cotenants to partition real property. Defendant filed a cross-petition seeking specific performance of an alleged agreement with plaintiffs to buy their interest in the property. After a demurrer to the cross-petition was sustained, the parties settled their controversy in writing and agreed that judgment should be entered. When defendant then attempted to appeal the order sustaining the demurrer, the appellate court held that the settlement precluded him from prosecuting his appeal. The court stated:

"This appeal should be dismissed for the reason that after the ruling of the court of which appellant now complains he entered into an agreement with the other parties to the action by which all controversies between the parties which had arisen in this litigation were compromised and settled; the rights of the respective parties were agreed to, and it was further agreed what judgment the court might enter in the cause, and such judgment has

been duly entered. This appellant is in no position to say that some controversy involved and previously considered in that litigation is now open to review." 144 Kan. at 223.

An order of contempt was appealed in *Guerrero v. Capitol Federal Savings & Loan Ass'n*, 197 Kan. 18, 415 P.2d 257 (1966). Appellant Manzanares was in civil and direct contempt for failure to comply with the previous order to transfer the amount of a savings account, the ownership of which was being controverted, to the jurisdiction of the court. In punishment for the contempt, Manzanares was sentenced to confinement in the county jail until he purged himself. When he applied for release from the court, he transferred the amount of funds ordered by the court into a joint control account held by the clerk of the court and Manzanares. This court found that, by the transfer of these funds, he purged himself of any possible contempt and left nothing upon which this court's judgment might act. Therefore, the question raised in the appeal was academic, and this court declined to review a question that no longer existed. 197 Kan. at 22.

In *Bair v. Bair*, 242 Kan. 629, 750 P.2d 994 (1988), appellant appealed from an order of the district court finding appellant in contempt of court. On appeal, this court noted that the order was no longer in effect and the appellant had "technically" purged himself of contempt. In holding the appeal moot, we said:

"The general rule on mootness was recently restated as follows:
" ' "[I]t is the duty of the courts to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles which cannot affect the matter in issue before the court." ' *Kimberlin v. City of Topeka*, 238 Kan. 299, 301, 710 P.2d 682 (1985) (quoting *City of Roeland Park v. Cross*, 229 Kan. 269, 270, 623 P.2d 1332 [1981]).

"Having determined that the order appealed from is no longer valid, the appeal therefrom is moot. There is no judgment this court could make as to the July 27, 1984, order which would in any way affect the present or future rights or obligations of the parties." 242 Kan. at 632.

In *NEA-Topeka, Inc. v. U.S.D. No. 501*, 227 Kan. 529, 531-32, 608 P.2d 920 (1980), the district court found prohibited practices occurred during negotiations to reach a professional agreement acceptable to the bargaining units. By the time this court considered the appeal, negotiations were over, and contracts were issued, accepted, and ratified. All questions involved in the appeal

were moot. This court held it had no power to render advisory opinions, either under a statutory provision or a constitutional provision; an attempt to do so would violate the separation of powers doctrine. 227 Kan. at 531.

Appellants respond that defendants have not established that an appellate decision here would be ineffectual. In *State ex rel. Stephan v. Pepsi-Cola Gen'l Bottlers, Inc.*, 232 Kan. 843, 844, 659 P.2d 213 (1983), this court stated that the Supreme Court would not decide questions when decisions are not applicable to actual controversies and judgment would be unavailing. Yet, an appeal would be dismissed only when it clearly and convincingly appears that an actual controversy has ceased and the only judgment that could be entered would be ineffectual for any purpose. Appellants argue that this appeal should not be dismissed because the judgment affects the rights of the person against whom it was rendered, Ayesh, even if the different decision would not be directly enforceable.

In support of their argument, appellants cite *Moore v. Smith*, 160 Kan. 167, 170-71, 160 P.2d 675 (1945), which we discussed at length in *Johnson*, to point out the generally accepted principles about mootness. Smith had been nominated in the primary election to serve as sheriff for an "unexpired" or "short term." In the general election, Moore was elected sheriff for the regular two-year term beginning in January. Moore brought an action to enjoin the county commissioners from certifying Smith as sheriff for the "unexpired" term, which expired by the time the appeal was considered. We stated:

"A 'moot case' has been variously defined. One common definition is that it is a case in which determination of an abstract question is sought when in reality there is no actual controversy existing. Another common definition is that it is one which seeks a judgment upon some matter which if rendered could not have any practical effect upon any then-existing controversy. (27 Words and Phrases, Perm. ed. 536, 538.) The fact that an issue has become moot does not necessarily mean that the appellate court is without jurisdiction to determine it. The rule is one of court policy, founded upon the sound proposition that except when under some statutory duty to do so courts do not sit for the purpose of giving opinions upon abstract propositions not involving actual controversy presented for determination.

"The rule as to moot issues requires further statement at this point. The fact that the only relief directly sought upon appellate review can no longer be given, owing to expiration of a period of time involved or to other change

in circumstances following judgment, is by no means always sufficient to justify dismissal of the appeal. One of the well-established conditions, as to dismissal, is stated in 4 C.J.S. 1945-1948, as follows:

'The appeal . . . will be dismissed . . . *unless . . . the judgment, if unreversed, will preclude the party against whom it stands as to a fact vital to his rights.*' (Italics supplied.) Similarly, it is said in 3 Am. Jur. 310: 'It is not every change in circumstances which might be said to render the case a moot one so as to require a dismissal of the appeal or error proceeding, however. Thus, there will be no dismissal '. . . whenever the judgment, if left unreversed, will preclude the party against whom it is rendered as to a fact vital to his rights, even though the judgment, if affirmed, may not be directly enforceable by reason of a lapse of time or change of circumstances.' " 160 Kan. at 170-71.

Appellants argue that the appeal here should not be dismissed because disqualification of an attorney continues to affect the attorney's vital rights even though the underlying litigation is resolved. In particular, appellants argue that the attorney may have his professional reputation tarnished or his fees denied as a result of the disqualification.

In *Moore*, this court denied the motion to dismiss for mootness because the "dismissal would unjustly affect the vital rights of the appellant in a controversy not fully determined." 160 Kan. at 176. The vital right of the appellant was his right to receive a salary or damages. Although the *Moore* court could not find any authority holding a dismissal for mootness would be res judicata, the court felt it would be unfair not to proceed as if dismissal for mootness were res judicata as to Moore's right to claim compensation.

If the decision of the district court granting disqualification is found to be erroneous here, a remedy of remand for reinstatement of Ayesh and his law firm as counsel for the estate will have no effect upon any pending litigation. Since the underlying lawsuit has been settled, if this case is remanded, appellants will have no clients to represent. Ayesh and his firm have made no specific allegation that they have suffered a loss of reputation or that their fees will be diminished because they have been found to have violated MRPC 1.9. A dismissal of the appeal for mootness would not be res judicata as to those two issues.

Defendants also contend that appellants here are not parties to the underlying lawsuit, as evidenced by the fact that their

names do not appear in the case caption. Defendants note that, at the hearing on the motion to reconsider, counsel for Ayesh and his firm argued that they were not parties to the litigation but, instead, were merely responding to a motion. Thus, defendants contend, Ayesh and the firm of Ayesh, Herd & Theis lack standing to pursue this appeal because they are not parties to the underlying proceeding.

This court has held that an attorney who is disqualified as a trustee retains no interest in an estate and cannot prosecute an appeal. *Achenbach v. Baker*, 151 Kan. 827, 838-39, 101 P.2d 937 (1940). Furthermore, an attorney for a school district cannot appeal a judgment without authority from the district. *School District v. School District*, 79 Kan. 407, 409-10, 99 Pac. 620 (1909).

The United States Court of Appeals for the Seventh Circuit in *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983), considered the standing of two law firms to appeal the lower court's disqualification of the law firms from representing a client. The client hired other counsel to proceed with the litigation and did not appeal the disqualification of the firms. One of the two law firms was ordered to pay $25,000 to the objecting party because it resisted the order of disqualification. Because this order to pay was invalid if the law firm should not have been disqualified, the firm had standing to appeal the order. The other firm, however, was not ordered to pay any fees or expenses and presented no evidence that it would be rehired. Because the party had replaced this firm, it had nothing to gain by seeking reversal of the order disqualifying it and, therefore, had no grounds for appeal. The court said:

"We first consider, on our own initiative as we must, whether Pressman and Hartunian has standing to appeal the order disqualifying it. Orders disqualifying counsel usually are appealed by clients upset by the prospect of losing the services of the lawyer of their choice and by the added expense of bringing substitute counsel up to speed. The client's standing to appeal is plain enough and an order disqualifying counsel, though interlocutory, is appealable, at least in this circuit. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 717-20 (7th Cir. 1982). If the client wants to keep the lawyer, the lawyer's standing also seems plain, since if the disqualification order stands he will lose the fees he would have made from the case. But in this case the client has not appealed. Analytica appears content with whatever substitute counsel it has procured. We therefore cannot see what

tangible object Pressman and Hartunian has in seeking reversal of the order disqualifying it. It has presented no evidence that it will be rehired and we have no reason to assume it will be, since that would require Analytica to replace the trial counsel it has hired in place of Pressman and Hartunian." 708 F.2d at 1266.

In the recent case of *Ryder v. Farmland Mut. Ins. Co.*, 248 Kan. 352, 807 P.2d 109 (1991), Ryder, the plaintiff, brought an action to recover for personal injuries sustained in a tractor/trailer truck accident. The case was settled and dismissed with prejudice as to all of the defendants. A California law firm, Fisher, Weathers & Geeting (FW&G), claimed it was entitled to a referral fee. The Kansas firm of Wallace, Saunders, Austin, Brown & Enochs (Wallace, Saunders), which represented Ryder, contended FW&G was not entitled to a referral fee and filed a post-settlement motion to approve its contingent attorney fee. The motion was filed in the name of Ryder. Ryder had recovered his full share of the settlement and had no interest in the division of the attorney fees. The district court denied FW&G's motion to dismiss Wallace, Saunders' motion and denied FW&G's claim for a referral fee. On appeal, this court considered the question of who the real parties in interest were in the controversy over the division of the attorney fees and concluded that Ryder was not one of them. We reversed the district court and remanded with directions to dismiss, stating:

"In the case at bar, Ryder's personal injury case had been dismissed as to each of the three named defendants. The Wallace, Saunders-FW&G litigation involved no petition, no answer, and no counterclaim. The case was not put on the regular discovery schedule. FW&G was not afforded full litigation procedures available under K.S.A. Chapter 60. FW&G was 'shut out' from asserting defenses and counterclaims. See *Rullman v. Rullman*, 81 Kan. 521, 524, 106 Pac. 52 (1910).

"Either the FW&G motion to dismiss should have been sustained (so that the controversy could be resolved in the federal case) or the contract dispute postured in the trial court with the law firms joined and designated as plaintiff and defendant.

"What now is a proper disposition? The declaratory judgment action filed by Wallace, Saunders against FW&G the day after Wallace, Saunders filed its attorney fees motion in the instant action establishes the law firms as plaintiff and defendant. The declaratory judgment action, removed to federal court, will provide each law firm with a full and fair opportunity to advance its contentions. Neither party will be 'shut out' from defenses and coun-

terclaims. In our view the declaratory judgment action provides the proper forum in which to settle the dispute.

"Ryder, the plaintiff in this case, is gone from this case. The three personal injury defendants are gone from this case. A dispute exists over the alleged agreement to divide an attorney fee between the two law firms. The federal declaratory judgment action filed by Wallace, Saunders as plaintiff and FW&G as defendant is 'standing at the ready.'

"We express no opinion on the final resolution of the dispute. We hold that the real parties in interest are the contesting law firms and not the absent parties who caption this lawsuit." 248 Kan. at 368.

In the present case, the plaintiff has settled his claim against the defendants. There are no parties left and no controversy remaining between the parties that has not been fully determined. We conclude that the issue of appellants' disqualification as counsel for the estate is moot and that, in addition, appellants do not have standing to raise that issue in this appeal.

In view of our decision dismissing this appeal we need not address the merits of the issues raised by appellants. The appeal is dismissed.

HERD, J., not participating.